# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

RAQUEL CAMPS,
in her capacity as the personal representative
of the estate of Alberto Camps, *et. al.*,

                                   Plaintiffs-Appellees,

EDUARDO CAPPELLO,
in his individual capacity, and in his capacity
as the personal representative of the
Estate of Eduardo Cappello,

                                   Plaintiff-Appellee/Cross Appellant,

v.

ROBERTO GUILLERMO BRAVO,

                                   Defendant-Appellant/Cross-Appellee.

On Appeal from The United States District Court
For The Southern District of Florida,
Case No.: 1:20-cv-24294-LFL

## DEFENDANT-APPELLANT ROBERTO GILLERMO BRAVO'S
## INITIAL BRIEF

HABER LAW, P.A.
Steven W. Davis
Roger A. Slade
Maria Soledad Bodero
251 NW 23rd Street
Miami, Florida 33127

Telephone No.: (305) 379-2400
sdavis@haber.law
rslade@haber.law
mbodero@haber.law
*Attorneys for Appellant/Defendant Roberto Bravo*
**Appeal Case No.: 23-12511-G**
***Bravo v. Camps, et al.***

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

The Appellant, ROBERTO GUILLERMO BRAVO, by and through undersigned counsel, pursuant to 11th Cir. R. 26.1-1(a), hereby states as follows:

Upon information and belief based on due diligence research performed, the following are believed to have an interest in the outcome of this case or appeal:

1. Maria Soledad Bodero, Esq.
   Haber Law, P.A.
   251 NW 23rd Street
   Miami, FL 33127

2. Estate of Ruben Bonet, Plaintiff

3. Estate of Alberto Camps, Plaintiff

4. Raquel Camps, Plainitff

5. Eduardo Cappello, Plaintiff

6. Estate of Eduardo Cappello, Plaintiff

7. Center for Justice and Accountability
   268 Bush Street, Suite 3432
   San Francisco, CA 94104

8. Steven W. Davis, Esq.
   Haber Law, P.A.
   251 NW 23rd Street
   Miami, FL 33127

9. Haber Law, P.A.
   251 NW 23rd Street
   Miami, FL 33127

10. John Watkins Keker

Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1704

11. Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1704

12. Ajay S. Krishnan, Esq.
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1704

13. Alicia Krueger, Plaintiff

14. Lauren Fleischer Louis, United States Magistrate Judge
C. Clyde Atkins US Courthouse
301 North Miami Avenue
Miami, FL 33128

15. Elzbieta T. Matthews
Center for Justice and Accountability
268 Bush Street, Suite 3432
San Francisco, CA 94104

16. Michael K. Moore, United States District Judge
Southern District of Florida
400 North Miami Avenue
Miami, FL 33126

17. Anita Margot Moss, Esq.
Markus Moss, PLLC
40 NW 3rd Street, PH 1
Miami, FL 33128

18. Markus Moss, PLLC
40 NW 3rd Street, PH 1
Miami, FL 33128

19. Franco Muzzio
    Keker, Van Nest & Peters LLP
    633 Battery Street
    San Francisco, CA 94111-1704

20. Neha Sabharwal
    633 Battery Street
    San Francisco, CA 94111-1704

21. Marcela Santucho, Plaintiff

22. Roger Alan Slade, Esq.
    Haber Law, P.A.
    251 NW 23rd Street
    Miami, FL 33127

23. Neal R. Sonnett, Esq.
    Neal R. Sonnett, P.A.
    2 Biscayne Blvd, Suite 2600
    Miami, FL 33131

24. Neal R. Sonnett, P.A.
    2 Biscayne Blvd, Suite 2600
    Miami, FL 33131

25. Claret Vargas, Esq.
    Center for Justice and Accountability
    268 Bush Street, Suite 3432
    San Francisco, CA 94104

26. Estate of Ana Maria Villarreal de Santucho, Plaintiff

HABER LAW, P.A.

By: _/s/ Steven W. Davis_____
STEVEN W. DAVIS, ESQ.
Florida Bar No.: 347442
*Counsel for Appellant Roberto Bravo*

# GLOSSARY OF TERMS

| | |
|---|---|
| Brennan | Plaintiffs' Expert James Brennan |
| Defendant | Appellant Roberto Guillermo Bravo |
| Extr. (2010) | In re Extradition of Roberto Guillermo Bravo, Case No. 1:10-mc-20559-RLD (S.D. Fla. March 1, 2010). |
| Extr. (2019) | In re Extradition of Roberto Guillermo Bravo, Case No. 1:19-mc-23851-EGT (S.D. Fla. September 16, 2019). |
| Langer | Plaintiffs' Expert Maximo Langer |
| Langer Rep. | Plaintiffs' Expert Maximo Langer's Report |
| Plaintiffs | Appellees/Plaintiffs Raquel Camps, Eduardo Cappello, Alicia Krueger, and Marcela Santucho |
| Pregliasco Rep. | Plaintiffs' Expert Rodolfo Pregliasco Report |
| TVPA | Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 (1994) |

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant/Defendant, pursuant to Federal Rules of Appellate Procedure 34(a) and Eleventh Circuit Rules 28-1(c) and 34-3(c), hereby requests oral argument. Oral Argument will assist this Court in consideration of the statute of limitations and equitable tolling of causes of actions under the Torture Victim Protection Act and Alien Tort Claims Act, 28 U.S.C. § 1350. Oral argument would aid this Court in determining whether the trial court erred when it applied equitable tolling to extend the statute of limitations with respect to events which occurred in 1972 until the filing date of the Complaint on October 20, 2020. The "equitable tolling" applied by the trial court in this case is the longest extension of the statute limitations under the TVPA in American history.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure ………….. C-1

Glossary of Terms ............................................................... i

Statement Regarding Oral Argument............................................... ii

Table of Contents …………………………………………………. iii

Table of Citations................................................................ iv- vi

Statement of Jurisdiction ...................................................... vii

Statement of the Issues .................................................... 1

Introduction ........................................................................ 3

Statement of the Case ........................................................ 8

Statement of the Facts ......................................................... 13

Standard of Review ………………………………………………... 21

Summary of Argument .................................................... 22

Argument and Citations of Authority............................................... 26

Conclusion ........................................................................ 57

Certificate of Complainace ………………………………………. 58

Certificate of Service ........................................................ 59

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Arce v. Garcia*, 434 F. 3d 1254 (11th Cir. 2006)   ………….. ………………………………………………………………     21, 27, 31, 45, 47

*Arthur v. Allen*, 452 F. 3d 1234 (11th Cir. 2006) ……………     27

*Boatwright v. Fla. Credit Union*, No. 22-12032, 2023 U.S. App. LEXIS 13218, (11th Cir. May 30, 2023) ……………..     28

*Birdsell v. Board of Fire & Police Comm'rs of City of Litchfield*, 854 F. 2d 204 (7th Cir. 1988) …………………….     44

*Cabello v. Fernandez-Larios*, 402 F. 3d 1148 (11th Cir. 2005) .............................................................................     3, 6, 21, 27, 28, 35, 44, 45

*Cioffe v. Morris*, 676 F. 2d 539 (11th Cir. 1982) ……………..     44

*Dobbs v. Martin Marietta Materials, Inc.*, No. 21-13533, 2022 U.S. App. LEXIS 25750(11th Cir. Sept. 14, 2022) …..     28, 36

*Eagle v. Am. Tel. & Tel. Co.*, 769 F. 2d 541 (9th Cir. 1985) …     43

*Garcia v. Chiquita Brands Int'l, Inc.*, 48 F. 4th 1202 (11th Cir. 2022) …………………………………………………...     39

*Halaw v. Wilding (In re Wilding)*, 620 B.R. 843 (Bankr. D.N.J. 2020) ………………………………………………...     44

*Harris v. Hutchison*, 209 F. 3d 325 (4th Cir. 2000) …………     27

*Huddleston v. United States*, 485 U.S. 681 (1988) …………..     55

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)………..     28

iv

| **Cases** | **Page(s)** |
|---|---|
| *Kipu Sys. v. Zencharts*, No. 17-cv-24733-WILLIAMS, 2020 U.S. Dist. LEXIS 257913, (S.D. Fla. Nov. 24, 2020)… | 44 |
| *Jackson v. Astrue*, 506 F. 3d 1349 (11th Cir. 2007) ………… | 28, 46 |
| *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021) …. | 42 |
| *Jean v. Dorelien*, 431 F. 3d 776 (11th Cir. 2005) …………… | 28, 45 |
| *Mackin*, 668 F. 2d 122, (2d Cir. 1981) ………………………. | 19 |
| *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250 (2016) …………………………………………… | 27 |
| *Miles v. Tenn. River Pulp & Paper Co.*, 862 F. 2d 1525 (11th Cir. 1989) …………………………………………. | 41 |
| *Moss v. Am. Private Equity, LLC*, No. 19-14777, 2021 U.S. App. LEXIS 31165, (11th Cir. Oct. 18, 2021) …… | 43 |
| *Palmer v. Bd. of Regents*, 208 F.3d 969 (11th Cir. 2000) …… | 21 |
| *Sandvik v. United States*, 177 F.3d 1269, (11th Cir. 1999)…. | 27 |
| *S. African Apartheid Litigation v. Daimler*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009) ………………………. | 42 |
| *Southland Distribs. Mktg. Co. v. S&P Co.*, 296 F.3d 1050 (11th Cir. 2002)……………………………… | 21 |
| *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)……. | 40 |

**Statutes**                                                    **Page(s)**

28 U.S.C. §§ 1291 …………………………………………..   vii

28 U.S.C. §§ 1331……………………………………………   vii

28 U.S.C. § 636 …………………………………………..   vii, 13, 17

28 U.S.C. § 1350 ……………………………………………   vii

Torture Victims Protection Act, and 28 U.S.C. § 1291    vii, 1, 3, 4, 6, 8, 11,
……..................................................................................   20, 22, 23, 26, 32,
                                                                33, 35, 37, 38, 39,
                                                                40, 44, 46, 47, 48


**Other**                                                       **Page(s)**

Ernesto J. Sanchez, *Column: Appellate Practice: Preserving*    41
*Claims of Error in Florida Federal and State Civil Actions:*
*Some Common Rules*, 92 Fla. Bar J. 57, 57 (Aug. 2016)

J. Cole, *Bad Acts Evidence in Civil Cases under Rule*          55
*404(b): It's Not Just for Prosecutor's Anymore,"* 36
Litigation Magazine 47, Spring 2011

# **STATEMENT OF JURISDICTION**

This Court's jurisdiction is based on 28 U.S.C. §§ 1331 and 1291. The United States District Court for the Southern District of Florida had jurisdiction pursuant to 28 U.S.C. § 1350, the Torture Victims Protection Act, and 28 U.S.C. § 1291.

Under 28 U.S.C. § 636(c)(3), the Courts of Appeals have jurisdiction over an appeal from a final judgment entered by a magistrate judge, but only if the parties consented to the magistrate's jurisdiction. The parties to this case explicitly consented to the Magistrate's jurisdiction in this matter on June 26, 2022. D.E. 123. Therefore, this Court has jurisdiction over an appeal of the Final Judgment entered in this case in which the Jury awarded Plaintiffs the following sums in compensatory damages: Plaintiff Camps: $1,000,000, Plaintiff Cappello: $250,000, Plaintiff Krueger: $4,500,000, and Plaintiff Santucho: $6,500,000; in addition to an amount of $3,000,000 to each Plaintiff in punitive damages.

**<u>STATEMENT OF THE ISSUES</u>**

1.    Whether the trial court abused its discretion or otherwise committed error when it equitably tolled the statute of limitations in connection with acts that occurred in 1972 until October 15, 2012?

    a.    Whether the trial court properly found that there were *extraordinary circumstances* to toll the statute of limitations from 2008 to October 2012?

    b.    Whether the trial court properly found that Plaintiffs were *unable to discover evidence* to support their TVPA claims until the conclusion of a criminal prosecution against other parties which concluded in Argentina in 2012?

    c.    Whether Plaintiffs *acted diligently in filing their TVPA action* in the United States?

2.    Whether, in a case in which the defendant was assigned to guard prisoners in a temporary holding facility, and has pled self-defense in response to the death of those prisoners, the trial court properly excluded evidence of the prisoners' documented propensity for violence which included, killing a prison guard at another prison in an escape attempt, hijacking a plane the week before, and generally

engaging in terrorist actions the expressed purpose of which was to overthrow the government in Argentina?

**INTRODUCTION**

This case involves equitable tolling as applied under the TVPA. The trial court proceedings include both jury and non-jury findings of facts because the trial court concluded that the tolling issue was incorrectly submitted to the jury. The trial court abused its discretion or otherwise clearly erred in tolling the claims of three of the Plaintiffs below until after an Argentinian criminal trial concluded. The record below shows that the latest tolling should have ever been allowed is up to and including March 2008, when the Plaintiffs admit they knew where the Defendant was located. Extending tolling until 2012 was wrong as a matter of law.

This case was brought under the TVPA which creates civil liability against individuals for torture and extrajudicial killing under color of foreign law. Claims brought under the TVPA are subject to a ten-year statute of limitations which the court can equitably toll only if "extraordinary circumstances" exist that create an impediment for plaintiff to timely file a civil action. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005). This Court has found that this impediment exists when defendant conceals himself or there is affirmative misconduct by a defendant, when a plaintiff is unable to discover "information regarding the circumstances and manner" of the wrong perpetrated, or when a plaintiff fears reprisal from a foreign regime in power to bring a TVPA claim in the United States. *Id.* at 1156.

Plaintiffs brought this action on October 20, 2020, **to seek redress for events that took place on August 22, 1972**, in a naval base in Trelew, Argentina, during the tenure of a military government then in power (the "Trelew Event"). To excuse their late filing, Plaintiffs identified several factors which they claim constitute "extraordinary circumstances" to toll the statute of limitations: (i) fear of reprisal from the military government; (ii) inability to locate Defendant; and (iii) that efforts to extradite Defendant from the United States to Argentina were ongoing. D.E. 91 at 8.[1] Plaintiffs argued at trial that they did not file their TVPA lawsuit in the United States earlier because they were relying on a criminal action that began in Argentina in 2005 against Defendant's alleged co-perpetrators.[2] According to Plaintiffs, they waited to file their TVPA suit in the United States because a criminal action in Argentina, involving other parties, could assist in Defendant's extradition.

In its Findings of Fact and Conclusions of Law (the "Order"), the trial court rejected the equitable tolling theories advanced by Plaintiffs. Specifically, the trial court found that there was no evidence of reprisal from the military regime past-2005. D.E. 180 at 18-19. It also found that Plaintiffs learned that Defendant was

---

[1] Plaintiffs conceded and refrain from arguing at trial that Defendant concealed himself. D.E. 140 at 87. In fact, Defendant has been living openly in the United States. D.E. 180 at 21, 9 ‖ 14.

[2] Under Argentine law, criminal defendants cannot be tried for criminal activity in absentia. D.E. 1 at 14, ‖ 72; D.E. 68-6 at 14 ‖ 13(e).

4

living in the United States by March 3, 2008. D.E. 180 at 10 ℙ 18. However, the trial court found that Plaintiffs **were unable to discover evidence in support of their claims** which became available "only after 2008" through the criminal prosecution of other parties in Argentina. D.E. 180 at 22. Based on this finding, the trial court concluded that "Plaintiffs' inability to discover evidence in support of their claims **tolled the statute of limitations until the conclusion of the criminal prosecution** against the other perpetrators [] in **October 2012**." D.E. 180 at 17 ℙ 26 (emphasis added).[3]

Plaintiffs never argued in the trial court that the inability to discover evidence should toll the statute of limitations past-2008 or to 2012. Plaintiffs conceded that, after 2008, *only* reliance upon certain "accountability" proceedings could toll the limitations period until 2010. D.E. 148 at 112-13, 142-43. Tolling until October 15, 2012 for the commencement of limitations was never argued by Plaintiffs as the applicable start date.

The trial court erred when it found the statute of limitations should be equitably tolled because Plaintiffs were unable to discover evidence in support of their claims until the "conclusion of the criminal prosecution", *i.e.*, October 2012. The record reflects that, since the 1970s, Plaintiffs were aware of Defendant's

---

[3] All emphasis in cites throughout this motion has been added by the undersigned.

identity and the manner in which their relatives either died or were injured during the Trelew Event. The record also reveals that Plaintiffs learned the last piece of information needed, Defendant's location, **on March 3, 2008**. There was no reason that Plaintiffs had to wait until 2020 to file their TVPA claims here.

The trial court abused its discretion when it concluded that "extraordinary circumstances" existed to toll the limitations period until the **conclusion** of the Argentinean criminal prosecution **in October 2012** because "[a] quantum of discoverable evidence sufficient to support a criminal conviction in Argentina was by that time discoverable and available to Plaintiffs." D.E. 180 at 17. The trial court erred in making this finding because Plaintiffs did not need to have enough information to support a ***criminal conviction***, to file a civil TVPA lawsuit in the United States.

The trial court also erred when it found that Plaintiffs Krueger, Santucho and Camps acted diligently in filing their TVPA claims in the United States after learning the facts surrounding the Trelew Event. *Cabello*, 402 F.3d at 1155. The fact that a plaintiff was pursuing civil or criminal actions in a foreign country, or even participating in extradition proceedings, does not release them from their obligation to act diligently and bring their TVPA claims within a reasonable time after discovering the information surrounding the triggering event. Plaintiffs knew all they needed to know by 2008.

6

Finally, the trial court also abused its discretion when it prevented Defendant from arguing at trial that the prisoners who were involved in the Trelew Event had a propensity for violence when, **one week before the Trelew Event**, these very same prisoners escaped from a maximum security prison, killed a prison guard in the process, wounded another, and thereafter attempted to hijack an airplane and held hostages at the Trelew airport. Defendant argued self-defense, but the jury was prevented from hearing this evidence by erroneous pretrial rulings of the trial court.

For these reasons, this Court should reverse and vacate the trial court's judgment against Defendant and dismiss Plaintiffs' claims as time barred.

## STATEMENT OF THE CASE

Plaintiffs filed their Complaint on October 20, 2020, seeking damages and asserting: (1) a claim under the TVPA for the extrajudicial killing of Rubén Bonet, Eduardo Cappello I, and Ana María Villarreal de Santucho; (2) a claim under the TVPA for the attempted extrajudicial killing of Alberto Camps; and (3) a claim under the TVPA for the torture of Rubén Bonet, Eduardo Cappello I, Ana María Villarreal de Santucho, and Alberto Camps.

Defendant Roberto Bravo answered the Complaint on January 25, 2021. D.E. 21. Defendant raised the statute of limitations as his second affirmative defense. D.E. 21 at 5. On February 8 and May 17, 2022, more than one year after filing their Complaint, Plaintiffs identified for the first time their position on tolling the statute of limitations. D.E. 60 at 9; D.E. 91 at 8-9. On March 15, 2022, Plaintiffs filed their Statement of Material Facts delineating the timeline of events in support of their position. D.E. 68.

On March 15, 2022, Plaintiffs filed their Motion in Limine to preclude references to Communism and Cuba, Motion for Summary Judgment to Dismiss Defendant's Seventh Affirmative Defense, and Motion in Limine to Exclude Improper Statements related to Seventh Affirmative Defense ("Motion in Limine"). D.E. 67. They also filed their Statement of Material Facts with exhibits including their expert Maximo Langer's Declaration and Report. D.E. 68.

On April 7, 2022, Defendant filed his Opposition to D.E. 68 wherein he argued, among other things, that the prisoners had a well-documented propensity for violence given that these very same prisoners had been involved in violent actions just days before they were captured and sent to Trelew. D.E. 85.

On May 17, 2022, the trial court held that "evidence, argument and/or suggestion" of the prisoners' past ties to communism and Cuba "is not relevant to, and therefore, not admissible" to either self-defense or propensity for violence, and "must be excluded from trial." D.E. 90 at 10, 13. The court concluded that it was "both irrelevant and improper character evidence." *Id.* at 13.

On May 17, 2022, the parties filed their Joint Pretrial Stipulation wherein Plaintiffs identified the "extraordinary circumstances" that warranted tolling the statute of limitations: (i) hostile circumstances in Argentina; (ii) inability to locate Defendant; and (iii) efforts to extradite Defendant to Argentina. D.E. 91 at 8.

On June 16, 2022, the parties filed their Joint Proposed Jury Instructions wherein, for the first time, the question of whether the judge or the jury should decide the question of equitable tolling was raised. D.E. 106 at 118-131.

Trial in this case commenced on June 27, 2022 (D.E. 132) and was held on the following days: June 28 (D.E. 140); June 29 (D.E. 142); June 30 (D.E. 145); and, July 1, 2022 (D.E. 148).

On June 28, 2022, Defendant filed his Motion for Directed Verdict or Judgment as a Matter of Law in which he argued that the question of equitable tolling should be decided by the judge rather than the jury, that Plaintiffs did not pursue their rights diligently, and that there were no "extraordinary circumstances" which warranted the tolling of the statute of limitations. D.E. 138. Plaintiffs filed their opposition on July 1, 2022, arguing that Plaintiffs' fear of reprisal and inability to investigate the facts surrounding the Trelew Event due to this fear existed past 2005, that they were unable to locate Defendant until 2008, and that equitable tolling was warranted because Plaintiffs were relying upon certain accountability proceedings taking place in Argentina. D.E. 144. The Motion for Directed Verdict was denied in open court. D.E. 148 at 95. The Motion was renewed by Defendant on July 1, 2022, in open court, and the trial court once again denied the Motion. D.E. 148 at 116.

The question of whether the statute of limitations should be equitably tolled was ultimately submitted to the jury even though Defendant had provided ample authority to the trial court that it was the trial court, not the jury, which should decide this issue. D.E. 148 at 191–93. Faced with an issue which should never have been submitted to the jury, the jury found that Plaintiffs proved by a preponderance of the evidence that extraordinary circumstances warranted that the statute of limitations should be equitably tolled. D.E. 148 at 199, 202. The jury returned a verdict against Defendant on July 1, 2023, in the total amount of $24,250,000. D.E. 153.

On July 29, 2022, Defendant filed his Renewed Motion for Judgment as a Matter of Law or, in the alternative, Motion for New Trial, in which he argued, among other things, that Plaintiffs had not met their burden of proving at trial that the statute of limitations should be equitably tolled. D.E. 162 at 2. Plaintiffs' Opposition argued that the jury reasonably found extraordinary circumstances of fear until at least 2010, inability to locate Defendant and information, and Plaintiffs' reliance upon Argentina's criminal proceedings warranted tolling. D.E. 164.

On March 31, 2023, long after the trial was over, the trial court reversed its earlier decision and ruled that the issue of whether the statute of limitations should be equitably tolled should have been decided by the judge. D.E. 177. The trial court ordered the parties to submit findings of fact and conclusions of law on the issue of equitable tolling. D.E. 177 at 15-16. The parties submitted their respective findings of fact and conclusion of law on April 14, 2023. D.E. 177 & 178.

On June 30, 2023, the trial court entered the Order making Findings of Fact and Conclusions of Law on Equitable Tolling. D.E. 180. Even though Plaintiffs never asserted this in their pleadings or at trial, the trial court found that Plaintiffs were unable to discover evidence in support of their TVPA claims until October 15, 2012, which was the date in which the criminal court in Argentina issued its decision against Defendant's alleged co-perpetrators **after years of litigation**. D.E. 180 at 17 at 12, 26. The trial court also found that Plaintiffs Krueger, Camps, and Santucho

diligently pursued their claims, and that equitable tolling was warranted for three of the four Plaintiffs until October 15, 2012. The trial court found that equitable tolling was not warranted for Plaintiff Eduardo Cappello II for lack of diligence in pursuing his claims in Argentina. D.E. 180 at 26.[4]

On July 11, 2023, the trial court entered an Order denying Defendant's Renewed Motion for Judgment as a Matter of Law. D.E. 181. On the same date, the trial court entered an Amended Judgment in favor of Plaintiffs-Appellees and against Defendant, and dismissing the claims brought by Plaintiff-Appellee/Cross-Appellant Eduardo Cappello, II, as barred by the statute of limitations.

On July 31, 2023, Defendant filed his Notice of Appeal. D.E. 183.

---

[4] Plaintiff Cappello filed a cross-appeal on August 14, 2023. D.E. 187.

## STATEMENT OF FACTS

Argentina's "Dirty War" began in the late 1960s, early 1970s. D.E. 145 at 142. During the 1970s and the 1980s, Argentina was governed by various military regimes. D.E. 180 at 5 ¶ 3. It was part of the government's national security strategy "that communist infiltration and the resulting social disorder had to be quelled." D.E. 68-7 at 35, 38. It was a dark period in Argentina's history. D.E. 132 at 65.

On August 15, 1972, several political militants belonging to leftist Argentinean organizations, such as the "Montoneros," the "People's Revolutionary Army (E.R.P.)" and the "Revolutionary Armed Forces (F.A.R)," who were being held in a federal prison in Rawson, Argentina, took over the prison. D.E. 60-6 at 175, 177; D.E. 68-7 at 20.[5] These prisoners were considered by the Argentinean military as "terrorists." D.E. 155-47 ("Auditor's Report") at 4 ¶ 1.[6]

---

[5] *See also* Langer Rep., D.E. 68-6 at 41 fn. 119, Exhibit 21 ("2014 Letter Rogatory"), attached hereto as **Exhibit "A,"** at 10-11, 15-16 (English)(the Langer Rep. was provided to the trial court during trial at D.E. 145 at 109); *see also* at **Extr. (2019),** at docket entries 1-2, EX-BRAVO-0636 to 653 (English). All the documents Bates Stamped "EX-BRAVO-XXXX," were part of the 2019 Extradition of which the trial court took judicial notice. D.E. 90 at 24 fn. 7.

[6] *See also* Plaintiffs' expert Langer testimony at trial recognizing that military labeled prisoners and others in these groups as "subversives." D.E. 132 at 62, 65; D.E. 1 ¶¶ 19–20, 23.

During the takeover and escape from Rawson prison, the prisoners killed a guard (Valenzuela) and injured another (Gallarraga). D.E. 60-6 at 138, 151; Exhibit "A," at p. 11;[7] D.E. 155-47 at 5.

Six of the prisoners who successfully escaped, reached the Trelew airport (where other political activists had "taken over the plane" traveling to Argentina), boarded such plane and landed in Chile, where its then President Salvador Allende, "allowed them to subsequently travel to Cuba." D.E. 68-7 at 20; D.E. 60-6 at 175 § VII, 148, 154; Exhibit "A" at 12.[8]

The nineteen remaining prisoners reached the Trelew airport too late, after the plane had taken off, and after "holding several people hostage,"[9] (and facing the impossibility of "taking" another plane), decided to surrender. D.E. 68-7 at 20; D.E. 60-6 at 175-176, 56; Exhibit "A" at 12.[10]  A "state of emergency was imposed on the area."   D.E. 60-6 at 176; D.E. 68-7 at 21.

---

[7] According to Gallarraga, Valenzuela was shot in the head by Plaintiff Santucho's mother, Ana Maria Villareal de Santucho. D.E. 85-6 at 2; D.E. 68-1 at 9.

[8] *See* Extr. (2019), at docket entries 1-2, EX-BRAVO-0639.

[9] These prisoners' speech during negotiations was "our intention is not to lose any lives, but if the prison is taken by storm, ***we are ready to resist and we are going to resist, we are ready to do so; we have weapons, and this is going to be a massacre*** we want to avoid." D.E. 60-6 at 136.

[10] *See* footnote 8.

14

From August 15 to 22, 1972, those nineteen prisoners were moved to, and held at, the Almirante Zar Naval Base in Trelew, Argentina. D.E. 180 at 5 ¶ 1; D.E. 132 at 15-16.

During the early hours on August 22, 1972, several military officers, including Defendant Bravo, who were present at the prison in Trelew, were involved in an incident where the prisoners were shot. D.E. 180 at 5 ¶ 1 ("Trelew Event"). Sixteen prisoners died, three survived. *Id.* According to Defendant's testimony, a prisoner picked up a gun and began shooting and "coming" at the officers when he yelled "fire" twice to stop the prisoners from advancing towards the guards. D.E. 140 at 121-122.

After the Trelew Event, three of the surviving prisoners provided several statements to investigators and the press with details of the Trelew confrontation. D.E. 68-6 at 46-48 ¶ 63; D.E. 60-4; D.E. 60-6 at 37; D.E. 155-12; 155-16.

Between 1972 and 1974, relatives of the three Plaintiffs in this case (Krueger, Santucho and Capello) filed civil actions against the Argentinean government seeking damages against the perpetrators of the Trelew Events (such as "Argentinean Civil Actions"). D.E. 145 at 106;[11] D.E. 180 at 12 ¶ 28. During the Argentinean Civil Actions, the government of Argentina filed answers in each case

---

[11] *See* D.E. 68-6 at 50 ¶¶ 67-68, fns. 161 & 163 (Langer Rep. Exhibits 7, 8, 9 & 10).

identifying the perpetrators of the Trelew Events by their full names, including Defendant Roberto Gullermo Bravo. *See id.*;[12] D.E. 164-2 at 21-22 (Plaintiff Krueger's testimony).

In 1972, Defendant re-located to the United States where he has lived openly since that time under his own name. D.E. 180 at 21. Defendant became a United States citizen in 1987. D.E. 180 at 9 ¶ 14. Defendant bought and sold property and opened businesses under his own name. D.E. 180 at 21; D.E. 140 at 216. He has lived in South Florida up to today.  D.E. 140 at 214.

Since Defendant left Argentina, the country has undergone significant political changes. In 1983, Argentina elected a democratic government. D.E. 180 at 6 ¶ 7; D.E. 132 at 67-68.

In 2003, Argentina began prosecuting individuals who participated in human rights violations committed during the military dictatorships. D.E. 180 at 7 ¶ 8; D.E. 132 at 78.

In 2005, criminal proceedings were instituted in Argentina regarding the Trelew Events. D.E. 180 at 9 ¶ 15. In its Order, the trial court found that after 2005, there was no widespread fear of reprisal by the military regime. D.E. 180 at 18-19.

---

[12] The relevant pages of Langer Rep. Exhibits 7, 8, 9 & 10, are attached herein as **Exhibit "B"** for ease of reference.

On March 9, 2006, the officers[13] involved in the Trelew Events were formally accused. D.E. 68-7, at p. 46.[14]

On August 21, 2007, Eduardo Duhalde, the Secretary for the Human Rights Department of the Ministry of Justice of Argentina, petitioned a federal judge in Argentina for the arrest of the participants of the Trelew Events, including Defendant Bravo. D.E. 68-6 at 47 fn. 146.[15]

On January 31, 2008, the Argentina Federal District Attorney Fernando O. Gelvez, requested that formal charges be brought against the suspects of the Trelew Events, including Defendant, and to issue arrest warrants, capture, and the taking of formal statements of same (the "D.A. Indictment").[16] Plaintiffs actively participated in this process. D.E. 164-1 at 26, 10 (Santucho); D.E. 145 at 168 (Camps); D.E. 140 at 55, 74, 80 (Cappello's grandmother); D.E. 164-2 at 14-15 (Krueger).[17]

---

[13] *See supra* fn. 2.

[14] Extr. (2019) at docket entries 1-2, EX-BRAVO-088 & EX-BRAVO-191.

[15] The correct date on the petition is August 21, 2007, not Apr. 17, 2007. *Contra* Langer Rep. D.E. 68-6, Exhibit 29, at 1618-24, attached herein **Exhibit "C,"** for ease of reference. This exhibit to Langer Rep. was discussed and analyzed during trial. D.E. 145 at 136-137.

[16] Exhibit "A" at 9 and 47. The D.A. Indictment details the facts gathered of the Trelew Events. Extr. (2019) at docket entries 1-2, EX-BRAVO-0636. The D.A. Indictment also details the evidence relied upon (testimonial and documentary) on which the charges are based. Extr. (2019) at docket entries 1-2, EX-BRAVO-0645.

[17] Plaintiff Krueger testified during this criminal investigation and presented evidence. D.E. 164-2 at 14-15. Plaintiff Camps testified that she assisted the prosecution to "start the investigation;" went to hearings, gathered documentation, and met with the attorneys. D.E. 145 at 170-171.

On February 1st, 2008, the Argentinean Federal Judge, Hugo Ricardo Sastre, based on the evidence before him (by way of Gelvez's indictment), issued an arrest warrant against Defendant. D.E. 68-6 (Exhibit 21); Exhibit "A" at 27, 67;[18] D.E. 1 at 14 ⁋ 71; D.E. 90 at 5.

On February 19, 2008, Judge Sastre instructed Interpol to order the international capture and immediate arrest of Defendant. D.E. 68-6 at 42, fn. 121; Exhibit "A" at 6, 42.[19]

On February 28, 2008, Judge Sastre requested the issuance of a Letter Rogatory to the United States to proceed with the arrest and formal extradition of Defendant. D.E. 68-6, at 14; Exhibit "A" at 6, 42.

On March 3, 2008, Interpol informed the Argentinean judge of Defendant's whereabouts in the State of Florida. D.E. 180, at 10 ⁋ 19; D.E. 155-28.

On March 1, 2010, a petition to extradite Defendant was filed in the Southern District of Florida *In re Extradition of Roberto Guillermo Bravo*, Case No. 1:10-mc-20559-RLD. Extr. (2010) at docket entry 1.

On November 1, 2010, the United States District Court denied the certification of Defendant's extradition. D.E. 180 at 10 ⁋ 19; D.E. 90 at 8 fn. 1; Extr. (2010) at

---

[18] This document was part of the 2010 and the 2019 Extraditions for which the trial court took judicial notice at D.E. 90 at 21 fn. 7 and D.E. 180 at 10 ⁋ 19. *See* Extr. (2019) at docket entries 1-2, EX-BRAVO-0654 to 657 & EX-BRAVO270 to 273.
[19] Extr. (2019) at docket entries 1-2, EX-BRAVO-0633; EX-BRAVO-0245.

docket entry 62. The trial court in this case took judicial notice of the 2010 Extradition. D.E. 90 at 24 fn. 7; D.E. 180, at 10 ¶ 19.

On October 15, 2012, the Argentinean Criminal Court rendered its judgment of conviction against three of the officers involved in the Trelew Event ("Argentine Judgment of Conviction"). D.E. 60-6.

On March 19, 2014, the Argentinean Appeals Court affirmed the Argentine Judgment of Conviction of the trial court. D.E. 68-7.

On September 16, 2019, a second petition to extradite Defendant was filed in the Southern District of Florida, *In re Extradition of Roberto Guillermo Bravo*, Case No. 1:19-mc-23851-EGT. *See* Extr. (2019) at docket entry 1; D.E. 90 at 5, fn. 2; D.E. 91 at 8, fn. 1; D.E. 60 at 9, fn. 1. The trial court also took judicial notice of the pendency of the 2019 Extradition. D.E. 90 at 24 fn. 7.

On October 3, 2023, the United States District Court denied the second request to extradite Defendant. Extr. (2019) at docket entry 51. The District Court found that Defendant's conduct during the Trelew Event fell within the political exception to the United States – Argentina extradition treaty. *See id.* The decision on extradition is final and is not subject to appeal. *See id.* at 42.[20]

---

[20] *See In re Mackin*, 668 F.2d 122, 125-30 (2d Cir. 1981) (holding there is no direct appeal from district judge's extradition decision).

The record evidence in the trial court established that Plaintiffs participated in, and supported, the Argentina criminal investigations, the Argentinean criminal case, and the extraditions since the inception of those proceedings. D.E. 180 at 9 ¶ 16; D.E. 1 at 14 ¶ 71, 17 ¶ 82.

Plaintiffs filed their TVPA complaint on October 20, 2020. D.E. 1.

## **STANDARD OF REVIEW**

Abuse of discretion is the standard of review of a trial court's decision to apply equitable tolling to a statute of limitations. *Arce v. Garcia*, 434 F.3d 1254, 1260 (11th Cir. 2006). A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous. *Arce*, 434 F.3d at 1260; *Southland Distribs. Mktg. Co. v. S&P Co.*, 296 F.3d 1050, 1055 (11th Cir. 2002) (reversing a judgment due to clear error in findings of fact). Whether the statute of limitations should be equitably tolled is purely a legal question subject to *de novo* review. *Cabello*, 402 F.3d at 1153.

Abuse of discretion is also the standard of review of a district court's evidentiary rulings. *Palmer v. Bd. of Regents*, 208 F.3d 969, 973 (11th Cir. 2000).

## SUMMARY OF ARGUMENT

Plaintiffs' causes of action arose on **August 22, 1972,** yet Plaintiffs did not file their TVPA claims in the trial court **until October 20, 2020 - more than forty-eight years later.** The lapse of time in between the occurrence of the events in question and the filing of this lawsuit makes this the oldest TVPA case, in which the Court found equitable tolling to apply, in United States' history.

The Trelew Event (upon which Plaintiffs' 2020 Complaint is based) was a national scandal in Argentina in 1972 and was public knowledge soon after the incident.[21] The survivors' and other witness' statements, along with other evidence that came to light in several judicial actions initiated in Argentina, reveal that all the relevant information about the alleged wrongs perpetrated against Plaintiffs' relatives was available decades ago. Indeed, even Defendant's identity was revealed to Plaintiffs in the 1970s Argentinean Civil Actions.

By 1983, Argentina had elected a democratic government. The trial court found no evidence of fear of reprisal by the military government after 2005.

It is undisputed that Defendant's whereabouts were known to Plaintiffs by March of 2008, at the latest. Plaintiffs did not allege any concealment or fraudulent

---

[21] Plaintiffs' expert Brennan testimony at trial categorized the Trelew Event as a "major public scandal." D.E. 132 at 62.

conduct by Defendant. Defendant has been living openly in the United States since 1972. Defendant became a United States citizen in 1987.

The trial court abused its discretion in equitably tolling the statute of limitations until October 15, 2012, because no extraordinary circumstances existed to warrant tolling until that date. Not even Plaintiffs argued at trial that the inability to discover evidence should toll the statute of limitations. Plaintiffs' only argument at trial was that their "reasonable reliance on the criminal proceeding" in Argentina should toll the statute past-2008. D.E. 140 at 35. There was no record evidence of any additional information that came to light in the criminal prosecution in Argentina after 2008. **Simply, there were no extraordinary circumstances preventing Plaintiffs from bringing this suit after March 2008.**

The trial court abused its discretion when it concluded that Plaintiffs met the due diligence requirement for equitable tolling and timely filed this TVPA action because they were pursuing remedies in Argentina. The trial court record reflects that, rather than exercising "diligence," Plaintiffs waited **forty-eight years before filing this action.** The passage of time made it difficult for Defendant to gather evidence to defend himself. The law requires that Plaintiffs act with due diligence and file their TVPA claim within a reasonable time after discovering the information necessary to bring the claim. There was no causal connection between the pendency of a criminal prosecution in a foreign country involving other defendants and

Plaintiffs' ability to file and litigate their civil claims for damages against Defendant in the United States. The Argentine criminal trial may have resolved the criminal claims against the other actors involved in the Trelew Event but, it could not, as a matter of Argentine law resolve any issue against Defendant.

The trial court's ruling that Plaintiffs were within their rights to wait until the conclusion of the Argentinean criminal proceedings because they lacked the information necessary to successfully prosecute their claims in this forum, was wrong for two reasons. First, the evidence clearly showed that the information Plaintiffs needed to prosecute the claims was clearly available to them. Second, the ruling ignores the obvious fact that there were a myriad of methods by which Plaintiffs could pursued the claims against Defendant in this lawsuit.

Thus, the trial court's finding that Plaintiffs Camps, Krueger and Santucho acted diligently by waiting until after the conclusion of a criminal trial in Argentina, against other parties, which could not possibly impact Defendant in any way, is clearly erroneous. Tolling the statute of limitations in this case until October 15, 2012, is not equitable since no extraordinary facts or circumstances existed after 2008 preventing Plaintiffs from filing this case within the limitations period – there had been a democratically elected government in Argentina since 1983, there was no basis for Plaintiffs to be in fear, and Plaintiffs certainly knew where Bravo was.

Finally, the trial court prevented Defendant from introducing even the suggestion that the prisoners had engaged in violence even though the prison break, and execution of a prison guard had occurred just days before. This was an abuse of discretion since it effectively prevented Defendant from establishing his claim of self-defense.

**ARGUMENT**

I. **PLAINTIFFS FAILED TO MEET THEIR BURDEN AT TRIAL OF ESTABLISHING THAT THE STATUTE OF LIMITATIONS SHOULD BE TOLLED FOR EVENTS THAT OCCURRED IN 1972 UP TO AND INCLUDING 2012**

This case is time batted under the TVPA. Even though the statute of limitations was interposed as a defense from the very beginning of the case, and that Plaintiffs changed their theory of equitable tolling multiple times both before and during trial, the trial court relied upon a theory of equitable tolling that neither side ever raised at trial (or before it) in holding that the statute of limitations should be tolled until 2012.[22]

Specifically, the trial court found that the statute of limitations should be tolled until the conclusion of a **seven-year criminal prosecution** against other participants in the Trelew Event (from 2005 to 2012). There was no legal basis for this ruling since there is no case law that holds that the prosecution of a criminal proceeding, in a foreign country, against other parties, can be used to toll the running of the statute of limitations to file a TVPA case in the United States.[23]

---

[22] In fact, Plaintiffs admitted on the record that their TVPA claim was untimely filed. D.E. 140 at 34-35 ("The Court: But that wouldn't –meaning if it tolled in 2005 [fear], 2008 [whereabouts of Defendant], the claim is untimely if that was- meaning if that's what you were traveling on. [Plaintiffs' Counsel]: Yes, you're right. It only gets us to 2005 [fear], 2008 [unknown whereabouts], and we filed in 2020. ***So, unless we get reasonable reliance on the criminal proceeding, then we have a problem***.").

[23] During trial, Plaintiffs argued that the statute of limitations should be tolled based upon Plaintiffs' claims that the ongoing criminal proceedings were the functional

Equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case." *Harris v. Hutchison*, 209 F.3d 325, 330 (4th Cir. 2000); *Arce* v. Garcia, 434 F.3d 1254, at 1261 (11th Cir. 2006). 1261 (depends on "a given set of facts"). For equitable tolling to apply, a litigant must establish: "(1) that he has been pursuing his rights **_diligently_**, **and** (2) that some **_extraordinary circumstance_** stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). A petitioner is not entitled to equitable tolling based on a showing of either extraordinary circumstances or diligence alone; **the petitioner must establish both**. *Arthur v. Allen*, 452 F.3d 1234, 1252 (11th Cir. 2006).

The plaintiff bears the burden of showing that such "extraordinary circumstances exist." *Arce*, 434 F.3d at 1261 (11th Cir. 2006). In determining whether a plaintiff has met this burden, a court must keep in mind that equitable tolling is an extraordinary remedy which should be extended only sparingly. *Id.* This is a **_fact-specific determination_** because a finding of "extraordinary circumstances" necessary for equitable tolling is reserved for extraordinary facts. *Cabello*, 402 F.3d at 1154-55. To apply equitable tolling, "courts usually require some affirmative

---

equivalent of a "truth and reconciliation commission" which had been recognized as a basis to toll the statute of limitations in other cases. However, the trial court, in its Order, rejected that argument. *See* D.E. 180 at 12, fn. 3.

misconduct, such as deliberate concealment." *Id.* at 1155; *see Jackson v. Astrue*, 506 F.3d 1349, 1354 (11th Cir. 2007). "Traditional equitable tolling principles require that the claimant demonstrate extraordinary circumstances such as fraud, misinformation, or deliberate concealment." *Id.* at 1355. Federal courts "define[] 'extraordinary circumstances' narrowly, and ignorance of the law" does not satisfy the test. *Id.* at 1356.

In addition to a showing of extraordinary circumstances, this Circuit has held that a "plaintiff should act with due diligence and file his or her action in a timely fashion in order for equitable tolling to apply." 402 F.3d at 1155. "A plaintiff must show that "**the delay in filing was <u>unavoidable</u>, even if the plaintiff acted with diligence**." *Boatwright v. Fla. Credit Union*, No. 22-12032, 2023 U.S. App. LEXIS 13218, at *2 (11th Cir. May 30, 2023); *see Jean v. Dorelien*, 431 F.3d 776, 779 (11th Cir. 2005). "[Federal courts] have generally been *much less forgiving* in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Thus, a plaintiff "must bring suit **within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information**." *Id. at 1155-56*, (when "the information surrounding [the person's] death became available."); *Dobbs v. Martin Marietta Materials, Inc.*, No. 21-13533, 2022 U.S. App. LEXIS 25750, at *6

(11th Cir. Sept. 14, 2022) (when a plaintiff **"had enough evidence"** to bring the claim).

## II. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT EQUITABLY TOLLED THE STATUTE OF LIMITATIONS UNTIL OCTOBER 15, 2012.

### A. There Were No "Extraordinary Circumstances" Which Warranted Tolling Beyond -2008

At trial (and in their pleadings), Plaintiffs identified as "extraordinary circumstances" three reasons to warrant equitable tolling: (i) hostility/fear of prosecution in Argentina, (ii) inability to locate Defendant, and (iii) Plaintiffs' pursuit of a criminal action in Argentina against the alleged co-perpetrators. D.E. 140 at 33-34; D.E. 60 at 9; D.E. 91 at 8-9. There was no mention at trial by Plaintiffs, or by anyone, that Plaintiffs were unable to discover evidence in support of their claims as a tolling factor. However, even if they did, the evidence at trial revealed that none of these factors warrant equitable tolling in this case.

### (i) No Fear of Military Regime Found Past-2005

Plaintiffs admitted in their filings (and during trial) that Argentina returned to a democratic government in 1983, that actions against the perpetrators of the Trelew Event began in Argentina in 2005, and that in 2006, five of the officers were formally indicted. D.E. 1 at 14; D.E. 180 at 6 ¶ 7; D.E. 140 at 33-34. After five days of trial, the trial court correctly found that there was no evidence of widespread fear of reprisal by the military regime after 2005. D.E. 180 at 18-19. Therefore, the statute

29

of limitations, based on this factor, could only be tolled until 2005, at the latest. Since the claims at issue in this case were not filed until 2020, Plaintiffs' claims would not have been timely under this theory of equitable tolling.

### (ii) Plaintiffs Admitted They Knew Defendant's Whereabouts By 2008

The trial court correctly found, based upon evidence in the record, that, as of March 3, 2008, Plaintiffs had become fully aware of both Defendant's full name and physical location. D.E. 180 at 20. Hence, the evidence before the trial court showed that the statute of limitations, based on the alleged inability to identify and locate Defendant could only be tolled until March 3, 2008, at the latest. Therefore, even if it was true that Plaintiffs were not aware of Defendant's full name[24] and whereabouts until March 3, 2008,[25] Plaintiffs had to file their claims by no later than March 2, 2018. Plaintiffs filed their claims on October 20, 2020, and therefore, those claims were untimely.

---

[24] The trial court erroneously found that all Plaintiffs testified that they did not know Defendant's full name until 2008. D.E. 180 at 21. Plaintiffs Santucho and Krueger never testified that they did not know Defendant's name; rather, they testified they did not know Defendant's location until 2008. D.E. 164-1 at 12; 164-2 at 17. In fact, Plaintiff Krueger testified that she knew Defendant's full name **in the 1970s**. D.E. 164-2 at 21-22. It is evident that if the other plaintiffs knew Defendant's full name since the 1970s, so did Plaintiffs Camps and Cappello.

[25] Plaintiffs admitted in their filings (and during trial) that they became aware of Defendant's location in 2008, at the latest, when Interpol informed the trial court in Argentina that Defendant was living in Florida. D.E. 140 at 33-34; D.E. 155-27; D.E. 60 at 9; D.E. 91 at 8-9.

Contrary to the trial court's finding, Defendant's full name was disclosed to the public in the Argentinean government's answers filed in the 1970s Argentinean Civil Actions brought by the survivors and the families of the deceased, **including Plaintiff Krueger and Plaintiff Camps' father**. Exhibit "B."[26] Defendant's full name was also displayed in the Auditor's Report which, according to the Argentinean Judgment of Conviction, was available to the parties during the Argentinean Civil Actions. D.E. 60-6 at 200; D.E. 155-47. Finally, the testimony of both Plaintiffs Camps and Cappello reveal their participation in the Argentinean criminal action wherein, since 2006, Defendant's full name was of record, including in its caption. D.E. 145 at 168 (Camps); D.E. 140 at 55 (through Cappello's grandmother).

In any case, based on this wrong factual finding,[27] the trial court further found in error that "Plaintiffs could not have located Bravo if they did not know his name."

---

[26] It begs the question, if Plaintiffs did not know Defendant's identity, why was Defendant sent into hiding so he could not be found as Plaintiffs and the trial court alleged? D.E. 180 at 21.

[27] Moreover, the trial court erred when it also found that the Auditor's Report, "labeled top secret and containing Defendant's full name, was not provided to the Argentine Court until in or about 2006. There was no evidence that Plaintiffs could have obtained access to this document before then." D.E. 180 at 20. First, it was Plaintiffs' burden to prove extraordinary circumstances, not Defendant's. *Arce*, 434 F.3d at 1261. Thus, the lack of evidence is of no consequence here. Further, the Argentine Judgment of Conviction states about the Auditor's Report: "It may not be said that it was concealed in secrecy, as the file was available to the parties during the civil legal proceedings and stages." D.E. 60-6 at 200. Therefore, any finding of secrecy has no basis.

D.E. 180 at 20. As the record shows, Plaintiffs knew Defendant's full name since the 1970s. Thus, Plaintiffs had decades to locate Defendant by a diligent search of his name, yet they didn't.

### (iii) The Conclusion of Criminal Proceedings in a Foreign Country Involving Other Parties Is Not a Factor that Support Tolling the Statute of Limitations

While the TVPA provides a certain level of flexibility regarding tolling factors, there is no case law that was cited by either the trial court or the Plaintiffs which identifies the pendency (much less the conclusion) of a foreign criminal proceeding against other parties as a basis to toll the statute of limitations against a civil defendant in a United States TVPA case. Affirming the trial court's ruling in that regard would require this Court to make new law. The trial court record reflects that the criminal proceedings in Argentina spanned seven years. Those proceedings did not even commence until 2005 – which was **thirty-three years** after the Trelew Event. When this Court adds another seven years to that period, through the end of the criminal trial in 2012, the tolling period becomes a total of **forty years**.

The problem is not only when the tolling period begins, but also when the period ends under this theory. Based upon the trial court's rationale, the tolling of the statute of limitations would be suspended until whatever time a foreign government decides to begin a criminal proceeding **and** issue a conviction in a criminal proceeding, even against individuals not the defendant in a TVPA case. This

is an example of the exception (equitable tolling) swallowing the rule (the ten-year statute of limitations).[28] The ten-year statute of limitations was enacted by Congress for a reason – to prevent the filing and litigation of stale claims. In this case, the litigation of those stale claims resulted in a $24,000,000 jury award.

### (iv)    Plaintiffs Had All the Factual Information Required to Bring Their TVPA Claims by No Later Than March 3, 2008

The evidence at trial reflects that all relevant evidence regarding the manner of Plaintiffs' relatives' death, the circumstances surrounding the Trelew Event, and the full names of the military officers who were involved in the same, was either available to or in Plaintiffs' possession soon after the Trelew Event occurred in 1972. The trial court's conclusion that Plaintiffs lacked the information necessary to file their TVPA claims until the criminal trial of other parties concluded in Argentina in 2012, is a results-oriented fact which is not supported by the record. In fact, the record evidence demonstrates precisely the opposite – that information regarding the Trelew Event, which Plaintiffs' own expert testified was a "national scandal," was widely available long before 2012.

---

[28] Even the trial court questioned Plaintiffs' theory of tolling during trial as it related to Plaintiffs claims that the pendency of the first extradition proceeding against Bravo should toll the statute of limitations:"[t]here is no statute of limitations for Mr. Bravo then? " D.E. 145 at 22. There was no rational basis for the trial court to distinguish between the pendency of an extradition proceeding as a tolling factor and a criminal trial.

For example, three of the surviving prisoners provided ***detailed*** accounts of the Trelew Event to the press and to the authorities **beginning in 1972**. D.E. 68-6 at 46-48 ⁋ 63; D.E. 60-4, 155-12, 155-16. Relatives of three Plaintiffs filed civil damages actions in the early 1970s against the Argentinean government wherein important evidence came to light such as the full names of the officers involved in the Trelew Event. D.E. 145 at 106; D.E. 180 at 12 ⁋ 28; Exhibit "B."[29]

Further, in **2005**, proceedings were instituted in Argentina related to the Trelew Event, including an open criminal complaint by the Ministry of Justice based upon hundreds of pages of evidence filed with the courts. D.E. 68-6 at 41, fn. 119; **Exhibit "C."** As a result, Fernando Gelvez, a federal prosecutor in Argentina, issued the detailed D.A. Indictment on **January 31, 2008**, requesting that a criminal judge issue arrest warrants for the officers involved in the Trelew Event, including Defendant, and specifying the evidence and legal basis in support of the request. D.E. 68-6 at 41-42, fn. 119-120; Exhibit "A" at 9.

Shortly after the D.A. Indictment, Judge Sastre, a criminal Judge in Argentina, issued an arrest warrant on **February 1st, 2008**, against Defendant based on the

---

[29] In addition, the book, "La Patria Fusilada," heavily relied by Plaintiffs and which excerpts were introduced at trial (D.E. 155-25), describes in detail the Trelew Event. Even the Argentinean trial court relied on the book. D.E. 60-6 at 106. The book was first published in **1973**, as a journalistic report, with interviews of the survivors, and details that constitute more than "enough information" for Plaintiffs to bring their TVPA claims in the United States as soon as they learned Defendant's location.

information and documentation provided by the federal prosecutor. *Id.*; Exhibit "A" at 27.[30] The trial court does not explain in its Order why an Argentine federal prosecutor apparently had enough information to obtain an indictment against Defendant in 2008, and a criminal judge to request his extradition that same year, yet these Plaintiffs allegedly did not have enough information to file a civil suit here.

Not only the evidence detailed above was available to Plaintiffs in Argentina, it was also available in the United States since at least March 1, 2010, when the first petition for extradition was filed.[31] Thus, by then, Plaintiffs had the information in the United States to bring this claim. Yet, they waited for more than ten years from even that date to do so.

Nowhere in the statute or in any TVPA case in the United States is there a requirement that a plaintiff needs to have enough information to support a ***criminal conviction***, to file a civil TVPA lawsuit in the United States. In fact, what the law requires is that the information surrounding the event, "the circumstances and manner" are discoverable or knowable to a plaintiff. *Cabello*, 402 F.3d at 1156.

---

[30] Based on this evidence, by **February 28, 2008**, Judge Sastre had requested the issuance of a letter rogatory requesting the international capture and extradition of Defendant. *Id;* Exhibit "A" at 6. By **March 3, 2008**, Interpol had informed Judge Sastre of Defendant's whereabouts in Florida. D.E. 155-27.

[31] Even, if for some reason, the trial court measured the running of the statute of limitations from March 1, 2010, when the first extradition proceeding was filed, Plaintiffs' claims would still have been untimely since they were not filed until October 20, 2020, more than ten years and seven months after the first extradition proceeding was filed.

Plaintiffs have had in their possession more than "enough information" for decades. **Thus, since March 3, 2008, at the latest, the clock on the ten-year statute of limitations began to run in this case.**

In short, Plaintiffs did not marshal any evidence during trial (and the trial court did not identify it either in its Order), of any extraordinary circumstance preventing Plaintiffs from filing this action after March 3, 2008, to warrant equitable tolling in this case. There was no "hidden" evidence that became available to Plaintiffs between March 3, 2008, and October 15, 2012. In fact, Plaintiffs did not even argue in the trial court that any particular "smoking gun" evidence somehow became available to them after 2008. Simply, Plaintiffs had until March 3, 2018, at the latest, to bring this action. By filing it on October 20, 2020, Plaintiffs filed outside the tolling period of the statute of limitations and, as a result, their claims are untimely.

Therefore, as the evidence at trial revealed, the statute of limitations based on Plaintiffs' "inability to discover evidence to support their claims" could only be tolled until March 3, 2008, at the latest, when the Defendant's location was known. As the record shows, more than "enough information" to bring this suit, was readily available to Plaintiffs for decades. *Dobbs*, 2022 U.S. App. LEXIS 25750, at *6.

To support its erroneous finding, the trial court held that Plaintiffs' forensic reconstruction expert, Roberto Preglaisco, was only able to "first visit[] the base in 2008" to create a reconstruction of the cell block. *Id.* at 22; D.E. 155-32. **There is**

**no evidence on the record that Pregliasco "first visited" Trelew in 2008 as found by the trial court**. Rather, Pregliasco's testimony was that he "made a trip to the city of Trelew in 2008," not that it was his first visit to the prison. D.E. 145 at 50.

In fact, according to the Argentinean Judgment of Conviction, the Argentinean criminal court ordered "judicial inspections during the investigative proceedings" as early as 2006. D.E. 60-6 at 39; *see also* Blueprints of the cells made by Pregliasco **in 2006**.[32][33] Thus, any evidence that could have resulted from visiting the Trelew prison was discoverable and available to Plaintiffs since at least 2006, not "only after 2008" as incorrectly found by the trial court. D.E. 180 at 22.[34] In any case, this finding begs the question: does a plaintiff need to have the evidence of a forensic reconstruction expert to bring his TVPA claims in the United States? Defendant suggests that that was not Congress' intent when enacting the statute of limitations.

Rule 11 only requires that in a complaint, plaintiff's counsel certify that, to the best of the person's knowledge, information, and belief, **formed after an**

---

[32] **Exhibit "C";** Ext. (2019) at docket entries 1-2, at EX-BRAVO-0329 – 0332; *also* Pregliasco's Report, PX0127 at p. 9 (stating he also visited prison in 2007).

[33] In addition to Pregliasco's blueprints of the reconstruction of the cells, the survivors and other witnesses provided drawings of the cells with their statements that were part of the Argentine actions and relied upon by Plaintiffs' Expert Langer in his Report. *See* Langer's Report at Exhibits 24-31.

[34] Compare the cell reconstruction by Pregliasco from the 2006 Blueprints to D.E. 155-32 (allegedly a product of his 2008 visit). They are identical.

**inquiry reasonable under the circumstances** that the factual contentions have evidentiary support or, if specifically, so identified, **will likely have evidentiary support after a reasonable inquiry for further investigation or discovery**. Fed R. Civ. P. (2023). There is no requirement that a Plaintiff in a TVPA case have supporting expert testimony for every single event that comprises a cause of action under the TVPA. As of 2008, Plaintiffs knew: (i) that Defendant was present during the Trelew Event; (ii) that he discharged his weapon; and, (iii) that sixteen people died and three others were injured. There is no requirement that a plaintiff have a forensic report prepared and in hand prior to filing.

As additional support for its finding, the trial court erroneously concluded that the Auditor's Report "was not made available to Plaintiffs until the Argentine criminal prosecution." D.E. 180 at 22. First, the trial court did not cite any evidence in support of this finding. Moreover, this finding is refuted by the Argentine Judgment of Conviction that states that the Report "was available to the parties during the civil legal proceedings and stages."[35] D.E. 60-6 at 200. As stated, the families of three of the Plaintiffs herein were parties to the Argentinean Civil Actions.

---

[35] The trial court's reference to the censorship of the military regime after the Trelew Event in this finding is of no consequence here since it found that there was no fear post-2005.

Thus, it is more than apparent that even Plaintiffs themselves could not settle upon a theory of equitable tolling because, to toll the limitations period in a TVPA case for the longest period of time in American jurisprudence, the tolling theory employed must be extremely persuasive. Even the trial court recognized that Plaintiffs fluid theories of tolling would not pass muster on appeal. And that is likely why the trial court made up its own theory of equitable tolling which was not pled by Plaintiffs in the trial court. The problem with that is that even the trial court's tolling theory is not persuasive since it has no basis in precedent and is not supported by the trial court record. Not to mention the fact that Defendant did not have an opportunity to rebut the trial court's theory since it was never timely advanced until long after the trial was over.

**(iv)   Plaintiffs' Shifting Theory of Equitable Tolling Prejudiced Defendant**

Once Defendant raised the statute of limitations as a defense, it was Plaintiffs' burden to show why it would not apply. *Garcia v. Chiquita Brands Int'l, Inc*., 48 F.4th 1202, 1220 (11th Cir. 2022). In the Joint Pre-Trial Stipulation, Plaintiffs identified three factors in support of their claim that "extraordinary circumstances" warranted tolling:

"**[1]** Plaintiffs faced unremittingly hostile circumstances in Argentina in response to attempts to pursue remedies;

**[2]** neither Plaintiffs nor Argentine prosecutors were able to locate Bravo until 2008; and

**[3]** *Argentina's efforts to extradite Bravo are ongoing*. *Each* of these circumstances tolls the TVPA limitations period."

D.E. 91 at 8.[36] These were **<u>all</u>** the facts that Plaintiffs pled in support of their defense of tolling the statute of limitations. At this point, Defendant did not know, for instance, when the statute of limitations began to run for this TVPA claim, as it was never pled by Plaintiffs. However, Plaintiffs' fluid theory of equitable tolling shifted shortly before trial to Defendant's prejudice and surprise. D.E. 142 at 30-32, 35.

As an initial matter, and as Defendant argued before the trial court during the hearing on Defendant's Motion for Judgment as a Matter of Law (D.E. 176), Plaintiffs are bound by their stipulations in D.E. 91. D.E. 176 at 8; *see also G.I.C. Corp. v. United States*, 121 F.3d 1447, 1450 (11th Cir. 1997)("parties are bound by their stipulations and a pretrial stipulation frames the issues for trial."); *Jaffe v. Bank of Am., N.A.*, 395 F. App'x 583, 592 (11th Cir. 2010) (parties "are bound by that stipulation. . . . Moreover, [they] failed to list the [the] issue in the pretrial stipulation as a disputed issue of fact or law.").

---

[36] When a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must ***specifically plead facts*** that make entitlement to estoppel plausible (not merely possible). *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).

Further, the law in this Circuit is clear, if a party does not include the required issues of law or fact in the pretrial stipulation, it **waives** their right to raise it at trial and no evidence should be allowed at trial.[37] *Miles v. Tenn. River Pulp & Paper Co.*, 862 F.2d 1525, 1529 (11th Cir. 1989). Nowhere in the Joint Pretrial Stipulation (or in any pleading filed by Plaintiffs prior to it), is there any mention of "**reasonable reliance upon a criminal proceeding**" as a factor for tolling the statute of limitations. With the understanding of the three **stipulated** tolling factors, and no start date for the limitations period, the parties prepared for trial.

Realizing that the identified factors did not take them over the ten-year threshold to make their complaint timely,[38] Plaintiffs disclosed their new factor for equitable tolling and the date in which the statute of limitations would finally begin

---

[37] "Pretrial Stipulations -- By providing a concise statement of facts that are admitted and need no proof, **as well as issues of fact and law that remain to be litigated**, a joint pretrial stipulation or pretrial order can provide a useful roadmap for a trial. **Failure to include required items in a pretrial stipulation, then, can have serious consequences given how courts have held that such a stipulation is equivalent or superior to the pleadings in importance, and that claims and defenses can be waived if not identified in the stipulation**." *See* Ernesto J. Sanchez, *Column: Appellate Practice: Preserving Claims of Error in Florida Federal and State Civil Actions: Some Common Rules*, 92 Fla. Bar J. 57, 57 (Aug. 2016).

[38] D.E. 140 at 35 ("MR. KRISHNAN: Yes, you're right. It only gets us to [fear] 2005, whereabouts] 2008, and we filed in 2020. So unless we get reasonable reliance on the criminal proceeding, then we have a problem.").

running in this case for the first time at trial.[39] However, even this new factor kept

shifting throughout the days of trial.  For example,

| Day 1<br>D.E. 132 at 35 | "[M]y clients have been **REASONABLY RELYING ON THE CRIMINAL JUSTICE PROCESS IN ARGENTINA** to hold Mr. Bravo accountable." |
|---|---|
| Day 2<br>D.E. 140 at 30 | "But it's a separate tolling factor from fear. It's the **PURSUIT AND RELIANCE ON DOMESTIC REMEDIES**." |
| Day 4<br>D.E. 145 at 20 | "It's plaintiffs' position that the **TIME AND EFFORT REQUIRED TO PARTICIPATE IN CRIMINAL PROCEEDINGS IN ARGENTINA IS ANALOGOUS AND SIMILAR TO THAT REQUIRED TO PARTICIPATE IN [TRUTH AND RECONCILIATION COMMISSIONS] PROCEEDINGS** in other situations." |
| Day 4<br>D.E. 145 at 22 | "The reason why **THE FIRST EXTRADITION PROCEEDING -- and IF THE JURY FINDS THAT WE SHOULD HAVE SUED AFTER THE FIRST EXTRADITION WAS DENIED, SO BE IT**. We're within the statute." |

---

[39] A week before trial, Plaintiffs' proposed jury instruction 5.1, read as follows in the pertinent part: "Such extraordinary circumstances include, but are not limited to, situations where a repressive regime exists, where litigants or witnesses fear or face danger pursuing claims related to human rights violations, where plaintiffs could not investigate their claims because of the circumstances in their home country, where plaintiffs were unable to locate the defendant, ***where plaintiffs did not pursue their claims in the United States while they were participating in or relying on accountability processes in the country where the incident occurred***, or where the defendant was immune from suit." D.E. 106 at 118. In support of the addition of the highlighted language, Plaintiffs cited to *Jane W. v. Thomas*, 560 F. Supp. 3d 855 (E.D. Pa. 2021) ("Liberia Case") and *S. African Apartheid Litigation v. Daimler*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009) ("South Africa Case"). D.E. 106 at 124. Defendant objected to Plaintiffs' instruction because neither the Liberia Case or the South Africa Case stand for the proposition that tolling is warranted "while [Plaintiffs] were participating in or relying on accountability processes in the country where the incident occurred." *Id.* at 130.

In other words, it was not until **day four of trial**, at 9:11 a.m. to be exact, that Defendant was finally put on notice of Plaintiffs' tolling theory of when, according to Plaintiffs, the statute of limitations in this case would begin to run. Not only Plaintiffs did not list it in the Pre-Trial Stipulation, but Defendant was left with no time to prepare for Plaintiffs' last-minute theory and was severely prejudiced.[40] Not to mention that the trial court's theory of equitable tolling, which was the basis for its Order, was never pled.

In short, Plaintiffs' theory for tolling morphed from "efforts to extradite are ongoing," disclosed at D.E. 91, to "reasonable reliance on the criminal proceedings" in Argentina, to "pursuit and reliance," to "time and effort" in a criminal proceeding in Argentina is analogous to a truth and reconciliation commission in Liberia or South Africa, as an extraordinary circumstance warranting tolling and only after pressure by the trial court during the ***fourth*** day of trial as to the legal basis for that factor. D.E. 145 at 19-20.[41] **Nowhere do Plaintiffs actually articulate that evidence was not available to them until the conclusion of the criminal trial.**

---

[40] *Moss v. Am. Private Equity, LLC*, No. 19-14777, 2021 U.S. App. LEXIS 31165, at *2 (11th Cir. Oct. 18, 2021)("On this record, we conclude that Mr. Moss would have been prejudiced because he had no notice of the releases being a separate and potentially case-dispositive issue and because he could have offered additional evidence or arguments on the releases."); *see Eagle v. Am. Tel. & Tel. Co.*, 769 F.2d 541, 548 (9th Cir. 1985)("It would be unfair to the [D]efendant[s] to permit the [P]laintiff[s] to change strategies at th[is] late stage of litigation.").
[41] Defendant objected to Plaintiffs' shifting theory of tolling in pleadings filed during the course of trial (day 2 and day 5), and in the Motion for Judgment as a Matter of

Tolling cannot be based on an unpled issue. *See generally Halaw v. Wilding (In re Wilding)*, 620 B.R. 843, 867 (Bankr. D.N.J. 2020) (denying tolling because not properly pled). Even more so when Defendant does not consent to add an unpled equitable theory of tolling. *Cioffe v. Morris*, 676 F.2d 539, 541 (11th Cir. 1982) ("[A] judgment may not be based on issues not presented in the pleadings and not tried with the express or implied consent of the parties."); *Kipu Sys. v. Zencharts*, No. 17-cv-24733-WILLIAMS, 2020 U.S. Dist. LEXIS 257913, at *23 (S.D. Fla. Nov. 24, 2020). As the trial court record amply demonstrates, Defendant did not consent.[42]

## B. **The Trial Court Abused Its Discretion When Concluding that Plaintiffs Krueger, Camps, and Santucho Were Diligent in Filing this TVPA Action**.

The doctrine of equitable tolling allows a court to toll the statute of limitations until such time "until the impediment to filing a cause of action is removed," so the ten years can start running. *Cabello*, 402 F.3d at 1156. A plaintiff "must bring suit **within a reasonable time after** he has obtained, or by due diligence could have obtained, the necessary information." *Id.* In *Cabello*, for instance, this Court found

---

Law. D.E. 138 at 12, 17; D.E. 146 at 2; D.E. 162 at 3; D.E. 177 at 11, 28, 32. Defendant also objected during argument at trial as to the prejudice and objected to the introduction of evidence on this last-minute theory. D.E. 145 at 122-123.

[42] Plaintiffs did not move to amend their pleadings, the pretrial stipulation or pre-trial order to conform the pleadings to their new theory and to allow for this factor to be considered as required by law. Rule 15(b)(2) embodies a liberal amendment policy to reflect the reality of trial proceedings, but does not allow a party to raise an issue that was never specifically identified at trial. *Birdsell v. Board of Fire & Police Comm'rs of City of Litchfield*, 854 F.2d 204, 209 (7th Cir. 1988).

that the clock began to run in 1990, "when the information surrounding Cabello's death became available" and when "the "military dictatorship lost power." *Id.* In *Jean*, this Court tolled the statute of limitations until "the democratically elected government resumed power." 431 F.3d at 688. In *Arce*, this Circuit tolled until the military regime fell because "only then could the evidence have come to light and [plaintiff] have made his claims without fear of reprisal against family and friends in El Salvador." 434 F.3d at 1265.

Plaintiffs did not show at trial that any extraordinary circumstance prevented them from exercising their rights and timely filing their TVPA claim until 2020 with respect to events which took place in 1972. Plaintiffs argued at trial that it was a "generalized" and "widespread" fear that prevented Plaintiffs from timely filing. D.E. 145 at 16, 30. Yet, they did not put forward any evidence that an official policy or conduct by anyone placed them in fear of their lives or that other external forces prevented them from bringing this suit. As a result, the trial court specifically found that there was no evidence of generalized fear. D.E. 180 at 18 ("Any finding of widespread fear of reprisal at the hands of the former military regime by [2005] would not be supported by a preponderance of evidence, and so this Court does not

make such a finding as to post-2005 fear.").[43] This is further supported by the admission by Plaintiffs during trial that fear "only gets us to 2005." D.E. 140 at 35.

Moreover, according to the testimony of **all** the Plaintiffs, they knew Defendant was residing in the United States by 2008. D.E. 140 at 40, 55 (Cappello); D.E. 164-1 at 34 (Santucho); 164-2 at 56 (Krueger); 145 at 173 (Camps). That is the last possible piece of evidence Plaintiffs needed to start the statute of limitations clock under the TVPA. The undisputed record before the trial court demonstrated that Plaintiffs had enough information regarding the Trelew Event, including Defendant's name and whereabouts, by March 3, 2008, to bring this suit within ten years. *See Yousuf v. Samantar*, No. 1:04-cv-1360, 2012 U.S. Dist. LEXIS 122403, at *1 (E.D. Va. Aug. 28, 2012) (tolling statute of limitations until defendant's whereabouts in the United States were known). Yet, they waited more than twelve years to file this action.

Accordingly, the trial court abused its discretion when it concluded that Plaintiffs Krueger, Camps, and Santucho acted diligently in bringing their TVPA

---

[43] Although not argued at trial, during Plaintiff Krueger's testimony, she hinted to the fact that she was excused for the late filing because she "didn't know that there was a possibility of having a lawyer in the United States where, you know, we could have a case such as the case today. I didn't have that understanding or information to proceed at that time." D.E. 145 at 86. However, ignorance of the law does not warrant equitable tolling. *See Jackson*, 506 F. 3d at 1356 ("ignorance of the law usually is not a factor that can warrant tolling" as it does not "show[] that her limited legal experience prevented her in some extraordinary way from timely filing").

claims in the United States. The fact that Plaintiffs were pursuing civil or criminal remedies in a foreign jurisdiction is irrelevant and the incorrect standard to apply here. Plaintiffs were required to bring this action by March 3, 2018, and they did not.

**C.** **The Virtually Infinite Period of Tolling Endorsed by the Trial Court Made It Impossible for Defendant to Defend These Claims.**

Statutes of limitations are designed to protect defendants from having to defend stale claims where the ability to gather evidence in the form of witnesses and documents is compromised by the passage of time. For events that occurred in 1972, in a foreign country, there is no question that the gathering of evidence to defend a lawsuit that was not filed until 2020 was extremely problematic. The trial court's Order disregarded the intent of Congress in enacting the TVPA when it created a very specific statute of limitations designed to provide a logical cutoff point for claims of this type. *See* Defendant's "TVPA's Statute of Limitations and Its Legislative History" at D.E. 162 at 9. Even this Court has stated that "[s]uch statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber **until evidence has been lost, memories have faded, and witnesses have disappeared**." *Arce*, 434 F. 3d at 1259. If prospective Plaintiffs were permitted to reach back into history to assert TVPA claims for past wrongs, as the trial court seem to have allowed here, there is no telling how far back in history claims could be asserted.

Nearly fifty years have passed since the Trelew Event. This case presents the longest period that a trial court has tolled the statute of limitations in a TVPA case in American history. D.E. 177 at 3. There is no other "TVPA case in which the statute of limitations has been tolled longer than the instant case." D.E. 177 at 2 fn. 3. It is contrary to Congress' legislative intent when enacting the TVPA to allow a plaintiff to wait for decades to come to a United States' court after learning the details of the incident at issue, whether due to negligence or ill-advice.

III. **THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PRECLUDED THE INTRODUCTION OF EVIDENCE RELEVANT TO SELF-DEFENSE**

A. **The Circumstances Surrounding the Trelew Event**

During the late 1960s-early 1970s, Argentina was going through one of the darkest periods in its history, largely known as the "Dirty War." D.E. 145 at 142. Courts in Argentina described this period as one of "extreme tension throughout the country." D.E. 60-6 at 273. As it is general knowledge, this was a period of great unrest and violence not only in Argentina, but especially in Latin America.

During the Dirty War, armed revolutionary groups were actively operating in Argentina with the purpose of overthrowing the government. As a result, the military government devised as a national security strategy "that communist infiltration and the resulting social disorder had to be quelled."[44] Urban "violent protests" by these

---

[44] D.E. 68-7 at 35, 38.

groups were common, for instance, like the one in Cordoba in 1971, known as the "Cordobazo," which violence has been described as one of "a large scale."[45] Given these upraising, the military was trained to be "on a war footing." D.E. 68-7 at 34.

In this volatile political environment in Argentina in 1972, there were 25 prisoners, **including the relatives of Plaintiffs herein**, who were being detained in a "maximum security"[46] federal prison in Rawson, Argentina. Exhibit "A," at 10-11. These prisoners were considered "terrorists"[47] by the military government because they were active members of different Argentinean revolutionary groups, mainly "Montoneros, People's Revolutionary Army (ERP), [and] Revolutionary Armed Forces (FAR)."[48] Indeed, Plaintiff Krueger's husband (Ruben Bonet), Plaintiff Capello's uncle (Eduardo Capello), and Plaintiff Santucho's mother (Ana Maria Villareal de Santucho), were all "ERP;" while Plaintiff Camps' father, Alberto Camps, was a member of the FAR.[49] On August 15, 1972, the 25 prisoners took over Rawson prison and escaped.[50]

The escape from Rawson maximum security prison was violent where the prisoners killed one guard, Juan Gregorio Valenzuela, and shot and injured another,

---

[45] D.E. 132 at 94; D.E. 60-6 at 273.
[46] D.E. 68-7 at 64.
[47] D.E. 155-47 at 4 ‖ 1.
[48] D.E. 60-6 at 175; D.E. 68-7 at 20.
[49] D.E. 60-6 at 177; D.E. 68-7 at 21-22.
[50] D.E. 60-6 at 175, 177; D.E. 68-7 at 20

Gallarraga.[51] According to accounts given at the time by a surviving, Gallarraga, it was Plaintiff Santucho's mother who actually shot Valenzuela in the head.[52] Six of the prisoners escaped to the Trelew airport where they boarded a passenger plane which had already been hijacked by their accomplices.[53] That hijacked flight later landed in Chile, where its left-leaning president, Salvador Allende, "allowed them to subsequently travel to Cuba."[54]

The remaining nineteen prisoners also reached the Trelew airport, albeit late, since the plane had already taken off to Chile.[55] During the ensuing stand-off at the airport, the armed prisoners held people hostage and negotiated with their military the terms of their surrender; in doing so, their speech was recounted as follows: "our intention is not to lose any lives, but if the prison is taken by storm, *we are ready to resist and we are going to resist, we are ready to do so; we have weapons and this is going to be a massacre* we want to avoid."[56] The nineteen prisoners later surrendered.[57]

---

[51] Exhibit "A," at p. 9; D.E. 60-6 at 138, 151.
[52] D.E. 85-6 at 2; D.E. 68-1 at 9.
[53] Exhibit "A" at 12; Extr. (2019) at docket entries 1-2, EX-BRAVO-0639; D.E. 60-6 at 175, 148, 154; D.E. 68-7 at 20.
[54] *See supra* fn. 53.
[55] *See supra* fn. 53.
[56] D.E. 60-6 at 136; *see* fn. 53.
[57] *See supra* fn. 53.

Given these events, the government declared a "state of emergency" in the area to try to control the escalating violence.[58] In the midst of this state of emergency, on August 15, 1972, the nineteen surrendered prisoners were transferred to the Trelew base were, on August 22, the Trelew Event took place wherein Defendant argued he acted in self-defense.[59] [60]

It was these nineteen prisoners that Defendant, a Lieutenant in the Navy with no experience guarding prisoners, was assigned to watch. Yet, the jury heard none of these facts as the introduction of any evidence regarding the violent Rawson prison break, the hijacking, the hostage standoff, their political affiliations, and their intention to overthrow the government was excluded by the trial court.

### B. The Evidence of the Prisoners' Propensity for Violence Should Not Have Been Excluded

Although Plaintiffs throughout the pretrial proceedings were hyper focused, and obviously in fear of the admission of evidence regarding their clients' documented affiliation with communist groups, the real issue was not communism but, rather, the prisoners' propensity for violence. Defendant always argued that the

---

[58] D.E. 60-6 at 176; D.E. 68-7 at 21, 29, 61.

[59] 180 at 5 ‖ 1; D.E. 132 at 15-16, 25.

[60] All these violent political events recounted herein were not only relied upon and included in the findings of fact and orders in the Argentinean court judgments, both at trial and appellate levels, but were also included in the orders issued by the United States District Court refusing to extradite Defendant to Argentina due in part to the political climate surrounding Defendant's actions during the Trelew Event. Extr. (2010) at docket entry 62 at 4-5; Extr. (2019) at docket entry 51 at 62.

series of events which occurred at Trelew in context explain why he was in fear for his life and why he was justified in the use of force to repel an unprovoked attack by the prisoners who had just "days earlier engaged in a previous prison break." D.E. 85 at 12; D.E. 90 at 8.[61]

Plaintiffs, however, argued at the trial level that Defendant should not be allowed to "invoke anti-communist sentiment, and improperly suggest that [the prisoners] were more likely to act violently because of their political views." D.E. 67 at 5. Plaintiffs claimed that Defendant's argument, "amount to impermissible character evidence that communists of those with ties to Cuba have greater propensity to violence. F.R.E. 404." D.E. 87 at 9.

Defendant vehemently opposed the exclusion of this evidence and argued that it is not character evidence, but that

> [t]he rationale for Mr. Bravo's decision to defend himself and others through the use of force is informed by the Trelew Prisoners' ***actual history of violence***, ***their penchant to escape from prison using such violence*** and the overarching theme of their objectives – the accomplishment of a political revolution in Argentina through the use of violence . . . ***That decision did not take place in a vacuum – it took place in the context of a series of preceding events about which the prison guards at Trelew were well aware before the first shot was fired***.

D.E. 85 at 12. In its Opposition, Defendant argued that the prisoners were members of these violent insurgent groups who had the express purpose to overtake the

---

[61] D.E. 91 at 6 ("The deceased prisoners were part of a communist terrorist group who were killed after seizing the gun of a guard while attempting to escape.").

government through violence. *Id.* at 4. They had violently escaped a maximum-security prison, killed a prison guard, injured another, hijacked a plane, fled to Chile and then Cuba, held innocent people hostage at gunpoint, and some later negotiated their surrender. *Id.* at 6-7. Defendant knew all these facts prior to the Trelew Event. *Id.* at 12.[62] [63] And as a result, "when self-defense is raised, evidence of the victim's . . . propensity for violence and the likelihood that the victim was the aggressor, while evidence of prior specific acts of violence by the victim is admissible ***to reveal the reasonableness of the defendant's apprehension at the time of the incident***." *Id.* at 12, fn. 14. That is the purpose for which Defendant was offering the evidence.

---

[62] All the officers stationed at Trelew, not only Defendant, knew that the prisoners violently escaped from Rawson Prison, killed a guard, injured another, took over the Trelew Airport, and held hostages. D.E. 60-6 at 62 (Lieutenant Corbeta "knew about [it] because, at such time, he was stationed outside the airport"); D.E. 67-1 at 14-17 ("was there any other reason that you considered the prisoners dangerous that you haven't told me yet? A. Well, every one of them, I don't remember the name of each, but in the history of their background, every one of them had activities very violent, disregarding for life, even the women.").

[63] The fact that there were violent political disturbances occurring in Argentina at the time of the Trelew Event, constituted the basis for a decision by the United States District Court for the Southern District of Florida to deny the certification of the second request by the government of Argentina for the extradition of Defendant, which a decision was issued as recently as October 3, 2023. Extr. (2019) at docket entry 51.

Despite all the above, the trial court, erroneously, agreed with Plaintiffs. D.E. 90 at 10.[64] Yet the trial court improperly conflated the issues of communist affiliation with propensity for violence. The Court found that:

> [E]vidence, argument and/or suggestion that the nineteen [prisoners] had ties to communism *is not relevant to, and therefore not admissible to prove that Defendant acted in self-defense*. In addition, that evidence, argument and/or suggestion *is inadmissible to prove the decedents had a propensity for violence and acted violently at Almirante Zar Naval Base the evening in question*. . . . Given that **this evidence is both irrelevant and improper character evidence, it is inadmissible and therefore excluded**. The Court need not conduct an analysis under Federal Rule Evidence 403, which applies to the exclusion of relevant evidence.

D.E. 90 at 13. Defendants did not seek to introduce evidence of the prisoners' political affiliations to the revolutionary insurgent groups ERP and FAR or ties to Cuba and communism for character evidence as suggested by the trial court. In fact, Defendant did not argue that in its Opposition. D.E. 85. Rather, Defendant argued that the prisoners' "actual history of violence" (given the background cited in the section above), was relevant admissible evidence necessary to show a different purpose than character evidence, such that Defendant's knowledge of these events and of the prisoners' identity as members of these groups that called for "the

---

[64] As to the trial court's reasoning that self-defense was not pleaded as a defense in Defendant's Answer, *see* D.E. 90 at 10, fn. 3, it was treated as such by the parties during the litigation and during trial. D.E. 145 at 7. Indeed, jury instructions were prepared by both parties and instructions given to the jury regarding this defense. D.E. 150 at 8.

accomplishment of a political revolution in Argentina through the use of violence,"
were well-known facts to Defendant at the time of the Trelew Event. D.E. 85 at 12.

Defendant argued that this evidence would help jurors understand the factual context through which Defendant would have filtered the facts available to him and his well-founded fear of significant bodily harm without decisive action when he encountered the prisoners. D.E. 85 at 12. In sum, Defendant was scared of the prisoners but the trial court, hung up on the prisoners' political affiliations without analyzing the prisoners' propensity for violence, denied Defendant the opportunity to explain why he was scared and that he had a good reason to be scared.

Federal Rule of Evidence 404(b), which applies in both civil and criminal cases, permits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character when the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Fed. R. Evid. 404; *see also Huddleston v. United States*, 485 U.S. 681 (1988). In *Huddleson*, the Supreme Court of the United States has found that "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Id.* at 685.[65]

---

[65] *See, e.g.*, J. Cole, Bad Acts Evidence in Civil Cases under Rule 404(b): It's Not Just for Prosecutor's Anymore," 36 Litigation Magazine 47, Spring 2011("Rule 404(b) is no longer just a staple of criminal cases. It is now being used in all manner

The evidence sought to be introduced by Defendant in this case was "probative of a material issue other than character." *Id.* at 686. The evidence of the prisoners' political affiliations with a propensity of violence was relevant not to prove the character of the prisoners, as suggested by Plaintiffs and the trial court, but to prove that the prisoners were engaged in a series of violent acts in the days before the Trelew Event, in similar circumstances as the ones claimed by Defendant, and that Defendant was well aware of them.

The trial court should have assessed the evidence under the usual rules for admissibility: "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." *Huddleston*, 485 U.S. at 781. In this case, the trial court did not make a finding of prejudice. Thus, as the prisoners' violent past given their political affiliations and propensity for violence was relevant, admissible evidence should have been allowed by the trial court. Therefore, the trial court abused its

---

of civil cases, from antitrust and breach of contract to wrongful death and everything in between, including civil rights cases, medical malpractice cases, fraud actions, securities litigation, insurance litigation, desegregation suits, libel and slander actions, nuisance suits, copyright infringement, punitive damages, and product liability actions").

discretion when it precluded the introduction of evidence relating to the prisoners' political affiliation, as irrelevant and inadmissible. [66]

## <u>CONCLUSION</u>

The trial court abused its discretion when unjustly applied the doctrine of equitable tolling until the arbitrary date of October 15, 2012. The claims filed against BRAVO were time barred. This requires reversal of the judgment rendered and dismissal of the causes of action against him.

---

[66] As a showing of how Defendant was prejudiced by the trial court's ruling not allowing the jury to hear evidence of the prisoners' violent past, see the following exchange while cross-examining Plaintiffs' expert, Brennan, during trial "[Defendant's Counsel: But at the same time, the Montoneros were engaged in violent activities; weren't they? [Plaintiffs' Counsel]: Objection, Your Honor, this is propensity evidence. [The Court]: Mr. Sonnett? [Defendant's Counsel]: What's the objection? [The Court]: Violation of the Court's prior ruling of the motion in limine I think is the objection. [Plaintiffs' Counsel]: Yes, Your Honor. [The Court]: Mr. Sonnett, focusing you back to the Court's prior ruling on the motion in limine on this topic, which it has precluded it. Sustained." D.E. 132 at 91-92.

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
## AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 13,955 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated: October 26, 2023

                              HABER LAW, P.A.


                              By:   */s/ Steven W. Davis*
                                    STEVEN W. DAVIS, ESQ.
                                    Florida Bar No.: 347442
                                    *Counsel for Appellant Roberto Bravo*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2023, a true and correct copy of the foregoing document was electronically filed through CM/ECF. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Dated: October 26, 2023

HABER LAW, P.A.

By: _/s/ Steven W. Davis_____
STEVEN W. DAVIS, ESQ.
Florida Bar No.: 347442
*Counsel for Appellant Roberto Bravo*